Case No. 18-1235, Brotherhood of Locomotive Engineers and Trainmen, a division of the Rail Conference of the International Brotherhood of Teamsters and Transportation Division of the International Association of Sheet Metal, Air, Rail and Transportation Workers v. Federal Railroad Administration and United States Department of Transportation Case No. 18-1235, Brotherhood of Locomotive Engineers and Trainmen, a division of the Rail Conference of the International Brotherhood of Teamsters and Transportation Good morning. Please record Kathy Krieger for the petitioners and with me at council table are the general counsels for the two petitioning unions here, Michael Wally and Kevin Brodar. We've laid out in our brief, our opening brief and our reply brief, all the requirements for this court to review the merits of our Hobbs Act review claim and as the court recently explained in the Maintenance of Way Employees case that we cited as supplemental authority, the standards for Hobbs Act review are exactly the same as the APA. In our case, we've demonstrated that there's been final action here by the FRA which was to approve a pilot program, a novel pilot program for first time cross-border transportation freight rail operations by a new to the United States railroad, KCSM. Where is that final order in the record? Our claim is that the action was done without using the process required under the controlling statute 49 U.S.C. 20103 which prescribes a specific substantive procedural standard for any program that involves a relaxation or variance from the standards applied to all railroads. And this program from its inception as the documents that the government produced in order to produce a certified record have demonstrated involved from the outset a proposal for a pilot program which is at JA 44. Right, but we can only review a final order. Yeah. Where is that order? They failed to put anything on the record. They failed to what? What they've produced is simply documents that demonstrate that as of the point when July 9, 2018, when they allowed this to happen with their approval and with their participation in monitoring, their actions made it clear this was final action and there was no further action that could be taken. But under the Hobbs Act, final agency action also has to be published, has to be on the record with notice. Right. Where has that happened? Yeah. We are alleging that in every aspect of this program, they failed to comply with any of the statutory and their own regulatory requirements that required it to be done on the record with a decision that explained how this was consistent with the public interest in rail safety. Well, you have the certificate order that was at least passively approved. Pardon? You have the Part 240 certificate order that was passively approved. Actually, that is only one aspect of it. I know, but that is an actual order that was approved. Sorry, but that is an actual order that they approved, adopted, took final agency decision action on through their passive. Technically, there was no order issued. What they did was simply allow it to take effect. No, but I think under the regulatory scheme they have, that means that as if on that 30th day, they stamp it with approved and they own that document. Yeah, it is not clear because there is no public record and the Hobbs Act actually requires that there be an order issued and there has been no order issued, which can be another. It is part of our claim that in no aspect of this did they follow the process that would have produced the kind of record available for full review on the merits, as you had in the maintenance of weight case where the agency put it on the record. It was very clear what the proposal was, what regulations were going to be varied, for what reason. There was full evaluation, an opportunity to make a hearing record, an opportunity to seek reconsideration of a decision, and ultimately the court was able to review the merits to find a contemporaneous rationale and decision that satisfied the Hobbs Act and the MPA standards of review. I don't understand. So you agree that the agency, with respect to both aspects of this case, is violating the Hobbs Act, right? They are violating the Hobbs Act. They are violating their own statute. They are violating their own regulations. And their own regulations. Okay, so therefore, why do we have jurisdiction? Because when final agency action is taken that does not comply with the regulations and statute requiring it to be done on the record through a particular process, this court has made it clear that it doesn't matter if the agency calls it something else, as in the OSHA case, for example, where OSHA says that it's going to be issuing an interpretation or a practice rather than a standard. And this court had no problem holding OSHA to the requirement that they go back and do it properly on the record as agency action that was following its own standards. And again, in the maintenance of way case, this court... In which case? Maintenance of way that we cited as our supplemental authority is just the latest example of how the agency does it right and actually approves variations from regulatory requirements as part of pilot programs, test programs, demonstration projects, but failed to do that at any stage in this case. Did the pilot program, did that require agency approval? Yes, it did. If you look at the very... From its very inception, there were three things that were proposed as part of it, and you can see it in the very first submission. It was record number 10, and it's at JA 47 and 49. From the very beginning, they call it a pilot program. They indicate that it will require the KCSM... Could you... I have a favor to ask you. Pardon? Would you please... I have to tell you, the initials you both used in your briefs, could you just call it the Mexican carrier and the American carrier? I'm trying not to be xenophobic, but I will call it... I mean, two of the three letters are identical. Yes. I'll call it Mexico and... American. American, okay. So the program from the onset had at least three elements that said were key. There had to be a way in which the Mexican Railroad's personnel could be trained, certified, and qualified to operate in the United States for a new railroad operating in the United States under standards that were compatible and consistent with law, or if there was a variance, the FRA would approve the variance. And then their second element was that it required that a waiver be given of the brake testing requirements at the border that KCSM would be able to use in order to operate in the United States. The Mexican carrier. Sorry, the Mexican carrier. And the third element, of course... The waiver, as I understand it, just to pause there for a moment, is simply that you can do the brake testing at the Laredo yard instead of on the bridge. Well, there's actually two types of brake testing. The full brake testing has to be done at the inception, or if you get a waiver... Under this waiver. Under the waiver, and you can do it at a location that's approved under certain conditions. The second part allows you to do an abbreviated test at the border in lieu of a full test. So the waiver here allowed them to do the mini test. I'm just going to call it the mini test on the bridge and delay the full test until at the Laredo yard. Is that right? The existing waiver that American, KCS American had, allowed KCS American to do that. Okay, I just want to make sure. Any other railroad on that track would have to apply for the same waiver. Okay, and so then, but as to the testing that's done at the Laredo yard, the big testing, is that done by KCS American? Even under this new what you call pilot program, do we know whether that's done by KCS American? It's not clear that... So we don't even know if there's an issue there. That might be perfectly fine. Because we don't even know what the operating conditions are, because there has been no public record made of what exactly would happen if KCSM were to apply for and show the basis for allowing a waiver, and then what would happen when it got to the Laredo yard. That would be on the record. But as long as the break testing is, what I'm trying to figure out is, if the break testing at the Laredo yard is done by KCS American employees, even if it's on a train that came up from KCS Mexico, would that fall within the waiver? I thought it would. It would not, because as we've shown in our reply brief, and we've noted every case in which a different railroad operates on the same stretch, they are not automatically granted the same waiver as the predecessor railroad that operated on that stretch of tracks. Each one is responsible for submitting itself, presenting its own justification for a waiver, and demonstrating what will happen. And the same thing occurs with regard to the first element of the program, which is the plan for certifying engineers and conductors. That was simply what KCSR did is said, we're willing to make our facilities available to certify another railroad's employees. But that other railroad has an obligation under 49 CFR section 101, excuse me, part 240 101 and part 242 101, to submit its own program saying how it's going to make that happen and how it's going to be responsible for ensuring that before commencing operations. So this is not a question of chasing after someone in policing. It's a situation in which the entire program was proposed in the same way that one would do a pilot program proposing involving different waivers and variances on the record, but without following any of the procedures that allowed the making of a record, the rational decision making contemporaneously by the agency, and an explanation of how they resolve the issues. The government spends most of its argument arguing that this is not a timely challenge, and they say in page 16 of their brief that you were aware of the, it was the 240 locomotive engineer certification program, that certificate order that had been approved by the FRA by at least June 27th, 2018. Do you dispute that or do you agree with that? Well, we dispute that there was an order. Do you dispute that you were aware that the 240 certificate order had been approved through the passive approval process? We were aware that KCS American had amended its engineer program and not its conductor program to allow to train another railroad's employees, but we did not know at the time that FRA was planning to allow that other railroad to commence operations without submitting to the agency its own program demonstrating how Servicios, its contractor, the actual employer of the employees that were going to be crewing, would actually, and how KCS in New Mexico, how they would actually propose to obtain their crew, make sure that their crew were in fact certified by this other railroad. In other words, each railroad independently has to maintain its own program covering its own trained crew operating personnel, and they can say we're going to rely on the certifications of another railroad if they comply and demonstrate how they do, and that would be part of it, but the other railroad that passively says we're willing to make our services available to certify doesn't absolve the actual operating railroad of the responsibility to present its own plan and to continuously monitor and report on how it is complying. In the Southern District of Texas case, the court concluded that you needed to go through arbitration. Do you know what the status of that arbitration is? Pardon? What is the status of that arbitration? The status, as I understand it, is that there had been proceedings commenced that has not yet been made. So the arbitration is still ongoing. It's still potentially pending. That aspect of it simply had to do with the private rights vis-a-vis KCS American and not with respect to what the FRA did with regard to permitting the operation of KCS Mexico under conditions that vary, as we've shown in our brief at great length, from hours of service requirements, from the brake testing waiver requirements, in all other respects. All the court has before it is the post hoc rationalization of agency counsel trying to explain that everything was done finally and everything was done for good reasons where the actual documents, including at JA 393 and 394, the last word we have, even the certification program, is that there were crucial unexplained and unresolved questions and next steps that needed to be accomplished and approved and no demonstration in the record of the agency doing that, how they resolved or what their justification was for even that one piece of the overall pilot program. Thank you. Okay. Thank you. Thank you. Good morning, Your Honors. Janie Lilly for the federal government. The unions here have identified only a putative pilot program as the action that they wish to challenge, but there, as we've explained in our brief, there is no pilot program, unlike the pilot program this court recently reviewed in the BMWED case. There have been no, there is simply no approval of a pilot program or suspension or waiver. Is that because they can operate without approval? Your Honor, because the U.S. Railroad has certified the crews on the 10-mile stretch of track and the waivers have been secured by the U.S. Railroad. So there's no agency decision at all, right? Is that your point? Yes, Your Honor, that there is no decision that would waive any of the requirements of the agency. Wait, no, not a question, not waiving. There's certainly agency action that happens to be implemented through passive approval here, but at least as to the Part 240 certification order. Yes, Your Honor. As to that, you agree there was that once the, I don't know if it was the 30th day or the 31st day, but the final agency action, shall we say, on the 31st day, they submit it to you. If you don't do anything, then on, shall we say, the 31st day, it says if FRA stamped approved on there. Yes, Your Honor. I thought we were speaking with respect to a pilot program or waiver. Okay, but I just want to talk, I'm sorry. Why don't we just continue with the waiver then and explain. So your view about that is. Are we talking about the brake waiver? No, I was talking about the 240 waiver. I thought that's what you were asking about. Oh, certificate. The one that was done in 30 days. Right, that's an approval. So the certification, they certify the engineers, and did they also certify the conductors? Yes, Your Honor. There was a certification of the, let me be clear, the certification is done by the railroad of individual employees, but the FRA approves the certification program, sort of the plan for ensuring that crews and conductors are complying with the qualifications. So the American Railroad approves or sort of extends its certification, takes responsibility for the Mexican engineers and conductors. Yes, Your Honor. And the agency blesses that. The agency approves the railroad's certification program, the sort of training and process, the process for certifying individual workers. Once that is approved, the railroad implements that by certifying, examining the qualifications. And is that the approval that occurred 30 days after they submitted it? I'm sorry, I couldn't hear the question. Is that the approval that occurred 30 days after they submitted it?  And that's the approval. And your argument is that they can't challenge that because they're out of time, right? Yes, Your Honor. But how, under the Hobbs Act, any final agency action has to be a written order on the record in accordance with the agency's own regulations. None of that happened here, right? Well, Your Honor, that is the case. We do know that the— So then the time for them to challenge this action hasn't even started running, has it? Well, Your Honor, if the claim is the lack of publication, then the court would look to sort of the track and mandamus factors. But really what they're— No, no, no, no, no, no, no. I'm sorry, go ahead. We would do what? In other words, we treat this as a mandamus? Well, if the claim here is that the agency did not publish or give notice of the certification approval, the regulations don't require it— Well, I'm sorry, wait. The regulations don't require it? Don't require the publication of an approval of the engineer certification program. What about—these aren't mentioned in the briefs, but the agency's regulations, 49 CFR 211.5, it says records of the Federal Railroad Administration are maintained in current docket form by the Federal Docket Management System, including grants of waivers. Were these on that docket system? Grants of waivers? Yeah. The waiver at issue, the brake test waiver that the plaintiffs have suggested was somehow part of a surreptitious pilot program, that was— No, no, I'm talking about the approval of the 240. The approval of the certification program. That's not a waiver. You don't characterize as a waiver. That's not a waiver. That's an approval. And I don't know the answer to whether that was in the docket management system that Your Honor refers to, but that is not a waiver, and so— So the agency's position—let me just make sure I know your position. The agency's position is that they're out of time because they failed within 60 days to challenge an order that did not comply with the Hobbs Act. Correct? Your Honor, they are out of time with respect to the approval of the certification. But you agreed with me that the certification— Was not made public. Was not made public, and it wasn't put on any docket, right? But Your Honor, there is no question that the union knew about the certification. Yeah, but what difference does that make? To be appealable, for someone to be able to challenge an order, it has to satisfy the terms of the Hobbs Act. I'm not aware of an exception to the final rule for people who happen to know about it. I mean, are you? Do you know of a case that says that? Not one offhand, Your Honor. It's not an actual notice statute. Yeah, I don't either. I'm sorry, Your Honor. The Hobbs Act is not just an ordinary notice statute. It's a duty on the agency. Right. Yes, Your Honor. It requires the agency to— The agency shall promptly give notice thereof by service or publication in accordance with its rules. So here the agency didn't either—didn't comply with the Hobbs Act. And what do you think its rules are with respect to these? If it's not the one I cited about the federal docket system, what is it? It would be the rules governing the approval of certification programs, which don't require publication. Oh, so there are no rules that require publication. I'm sorry? There are no rules, agency rules, that require publication. Exactly, Your Honor. So you have to do it in the Federal Register under the Hobbs Act. You have to do it somewhere under the Hobbs Act, don't you? Doesn't the agency have to publish this? Isn't that what this language says? And how can you hold—how can the agency possibly hold petitioner responsible for not filing within 60 days if you didn't— the whole purpose of this Hobbs Act requirement is to give people notice of their obligation to challenge an agency action. That's why it's there. Yes, Your Honor. If I may respond. Sure. With respect to plaintiff—what plaintiff is actually challenging is this purported pilot program. They have identified the certification as something that is tangentially allowing this pilot program— Well, then, excuse me. I'm sorry to interrupt you, but why are you arguing in your brief, then, that they're out of time with respect to the approval of the 240 and 242 certifications? Because, Your Honor, the challenge was brought well after they knew about it, and, in fact, the thrust of their challenge isn't to the certification. So the thrust of their challenge, but their challenge encompasses these certification orders, right? There may be some pieces that they—your theory is they can't challenge, but there are some that are. And as to those, you said it was untimely because they had actual notice, which is not what the statute says. It's quite explicit as to what starts the running of the statute of limitations period and what the agency's obligations are. And we have held—we have held that if the agency doesn't publish, the clock doesn't start running. So under what theory are you arguing that their challenges to the certification orders are untimely, given our precedent? Well, Your Honor, the challenge to the certification order is, in fact, as I understand it from plaintiff's brief, and it's a little bit of a moving target in their presentation, is that there was no certification of the Mexican Railroad. So it was actually an absence of an order. It was this challenge to this pilot program. Let me explain to you how I—the way I read the brief in your response. I read them as saying they're challenging two things. They're challenging what they call the Laredo Project, which is allowing the trains to—Mexican trains to move to the United States, right? Yes, Your Honor. That's number one. Yes. And you respond to that by saying, well, there's no order. We didn't— There's no approval of that. Exactly, Your Honor. And the second thing they're arguing is the 240-242 plans, and with respect to that, your brief argues that they're out of time, and even if they're not, they knew about it. So why am I misunderstanding something here, that there's two separate things they're challenging? Your Honor, again, it's a bit of a moving target. The plaintiffs have sort of suggested— I'm only reading the briefs, their brief and your response. Yes, Your Honor. And your response is they are out of time with respect to the 240 and 242 approvals that occurred 30 days after they were filed. Are you now telling me they're not challenging those? Your Honor, this has been principally what the dispute has been about in the motion to dismiss stage and before this court, is that the unions are challenging some putative pilot program. They've alluded to the certification approval, but they say what the agency did was green-light trains coming from Mexico to Laredo, and that's not, in fact, what happened. Including the green-lighting of crews, engineers and conductors coming from Mexico, which is what's covered by 240 and 242 certification. Well, no, Your Honor. What has happened there is that the agency has approved certification programs, the conductor certification program several years ago and a modification to the crew certification programs. But you told them they didn't need—you specifically told them in the emails, at least, they don't need to change the 242. That's right, Your Honor. So that was a decision by the FRA that they didn't need to make any more changes to the conductor 242. That's right, Your Honor. And there was the final agency action, as you have described it, of the passive approval of the 240 certification program, which does address the training of the engineers from Mexico, correct? Yes, Your Honor. And if they stand up and say one of the things we wish to challenge is the certification orders as applied to these engineers, certainly the engineers and maybe also the conductors coming from Mexico, your only answer, as I saw it from the brief, was that they were untimely. No, Your Honor. That is not our only answer. Our answer is that the underlying decision that they have identified for review is this putative pilot program, and they point to a number of theoretical waivers of different safety requirements, and none of that is— So people can file suits and say we're challenging A, B, C, D, E, F. Yes. And the government can come up and say, well, as to A, B, C, D, there's no final agency action, and they can win that, but they don't get rid of the whole case if, in fact, they concede there's final agency action as to E, F. There's no basis for dismissing those two because there is final agency action. There's documents. Right. But you're saying it doesn't— You've agreed their final agency action, and it's just a question of put aside the merits of the argument. Right. I didn't mean to imply you were giving up on that. No. But as to timing, as to those two, your timing argument is an actual notice argument, correct? Yes, Your Honor. And I thought you agreed that the Hobbs Act is not an actual notice statute for triggering the 60-day limitation period, correct? Yes, Your Honor. Textually, you just have to let that one go. Yes. Okay. So that's no answer to why—or no argument as to why, as to my E, F, that they are untimely. So then where are we? They're timely. And then if we have precedent that says when the government doesn't publish, the clock doesn't start running, then you take my word for it that we have precedent that says that. It's public citizen versus NRC. Right. But then— How do you get past that? Well, then, Your Honor, then they haven't challenged the order. I think that's— So the agency can insulate itself. They haven't challenged the order. The agency insulates itself from any of this simply by never publishing a final order. Is that right? No, Your Honor. That's the effect of what you're saying. That was your answer to Judge Millett. That's what you just said. There is no—yes, the time hasn't started running, but there's no final order for them to challenge. Right? Then, Your Honor, then the—if the agency were to publish its order, then they could bring the challenge, if that's the court's concern. That's just not the way the homicide case is supposed to work. Right. The entry is what you have to do before they can have a challenge under our precedent. But your brief says on page 16, the approval was January—I think we got the dates off because they did January 19th. But, anyhow, your brief says that it was approved on January 31st. I thought—anyhow, assume that date for these purposes. Any petition for review of the approval of the modifications just would have been due by April 2nd. So you agree—and the only way you can say that sentence is if you agree the passive approval was the entry for purposes of the Hobbs Act that started the clock running. Yes, Your Honor. Okay. So we have an entry of final agency action order approving the certificate order. I mean, it's only 241 at this point. Yes. And so the clock started running, you say, until—so the entry happened. And what we're saying to you is fine, but we have precedent that says when you've entered the final order for your own agency purposes, but you have not published it. Yes. There is an action that can be challenged, but the clock doesn't start running on them until it's published. It doesn't mean they can't challenge it if they somehow find out about it. But they are not out of time if you haven't published. That's how I put it. As long as you've entered, which your argument says you have, then they aren't out of time. Then our response, Your Honor, is that their challenge—that they have not substantively challenged the approval of the certification program itself. That their challenge is simply that the agency did not secure an approval from the Mexican Railroad of a different certification. No, I think— That's the merits of the case, right? Yes, Your Honor. That's the merits, but that's not what we're talking about at the moment. You're telling us we can't get to the merits. Yes, Your Honor. Right. It's not that— Go ahead. No, go ahead. It's simply that— I'm in circles here. What their argument is as to the certification order is not that you're missing an order from the Mexican Railroad. It's that what the agency passively approved was the American Railroad certifying engineers from a different railroad. That's their APA argument. That's not a missing order. The argument in their briefing about the pilot program and their argument before this court now was that the agency somehow issued a secret order that required no certification from the Mexican Railroad, and that's not what happened. It approved the certification program of the U.S. Railroad. Let's hear from the intervener and see if we can get some clarification there, unless you're way out of time. Good morning. Aaron Markell on behalf of the Railroads. We agree with the government that the petition should be dismissed for lack of jurisdiction. I'd like to briefly discuss the merits. No, wait. Don't go on to the merits. You don't get away with that. You have to explain to us why they're out of time, since the agency concedes that it did not comply with the Hobbs Act. Of course. Actually, I'd like to pick up on Judge Lutz's question of where it leaves us if you look past the timeliness question. And even if we concede, and I don't think we do, that the petition was timely, that still doesn't give this court jurisdiction, because the unions did not specify that it was challenging either the Part 240 or the Part 242 certification in their petition. And even in their statement of underlying decision, which was filed more than a month later, they still didn't identify either of those. Is that a jurisdictional requirement? Well, certainly this court has said various times that if you don't specify them and attach them as required by the Hobbs Act and Rule 15, this court will not review those. Is that a jurisdictional requirement? Because your arguments here have only been about jurisdiction. I believe so. I think this court said in energy probe that attaching the petition within the 60-day limitations period was a jurisdiction. Wait, if there's a violation of the Hobbs Act, I don't see how we get to your question. Why don't we get to the question of whether their petition is adequate? If there's a violation of the Hobbs Act, they're not out of time for filing a petition. Well, your Honor, I'm not specifically speaking about time here. We know from the letters they sent, we know from their counterclaim that they filed in the Southern District of Texas and their opposition to our petition. Again, that's an actual notice argument. Is it your position that the Hobbs Act is an actual notice statute? I don't see that textually. No, but what I'm saying is in regards to specifying the orders that they're challenging and attaching them to their petition, we know that they had the Part 240 approved program and the Part 242 program, but they never said in their petition. So you believe that challenging those certification orders is part of what their claims are here? Well, from reading their petition, I would say affirmatively it is not part of what they're challenging here. There's no indication in their petition, and certainly it is what has morphed into, but there's absolutely no indication from their petition or their later filed statement of underlying action that that's what they're challenging. Then why did the agency respond that they're out of time? Well, I think... I don't understand that. What both the railroads and the agency have been grappling a little bit with here is trying to figure out what exactly they are challenging. But you must have thought they were challenging the 240 plan. Otherwise, why would you have said they're out of time? Because they... Why did you say they... Why did the agency and your clients say that they're out of time because they failed to file within 60 days of the February, whatever the date is, approval, sub salientio approval? Well, because I think... Unless... I mean, why did... You see what I mean? I mean, all I knew about this case when I got in here this morning was what I read in your briefs. And the briefs say they're challenging the 240 and 242 plans, but they're out of time. Now you're all telling us that's not what they're challenging. So from the motions to dismiss, I think those make fairly clear that we were trying to hit every possible avenue that we could imagine that the unions were challenging. We discussed whether there was a final... Well, they say there's a lot of stuff going on. Yes. And you all march through it and say some of that stuff is enforcement discretion. But no, everyone knows you can't say that as to the certificate orders. And it's certainly within the umbrella of whether you call it a pilot program or not, part of what happened here to allow the trains from Mexico to start coming in with Mexican crews, unquestionably part of what happened and what your clients made sure they did before they started it was getting these certificate orders approved. Correct? Absolutely. You knew you had to do that before you could start bringing these crews in. Isn't that correct? No one disputes. So when someone challenges you bringing the crews in and they challenge all different aspects of it, they're necessarily challenging the thing that you admit you had to do before you could start bringing them in. Well, what this court has said is that it's not the government or, in this case, the intervener's job to guess at what the petitioners were challenging. Not guessing. This is a central thing that everyone agrees you had to do to start bringing these crews in. The question is whether there's other stuff out there. I'm not sure that's a fair characterization because the union hasn't really brought any specific challenge to the Part 242 program that was approved a number of years ago. I think they very much argued that you can't have one railroad approving the crew for another railroad just because they're siblings under a parent company. I think they very much argued that. I don't think I made that up. So they certainly identify specific things they do not like about the 242 program with regard to, for instance, whether there's the same amount of classroom training. And the 240. Yeah, sorry, the 240 program. They raised no similar arguments with regard to the 242 program. So, like I said, the railroads were left a little bit guessing on what exactly they are challenging. Yes, they are certainly challenging whether a railroad can rely on the certifications of a different railroad with regard to its crew members. We think that's squarely foreclosed by Part 242.25 and 242.125, which specifically say that railroads may rely on the certification determinations of another railroad. And that's what is exactly happening here. Anything else? Okay, thank you. Council had no time left, right? I do not have any. No. Oh, you do. Go ahead. Sorry. No, no, he's talking about petitioners. I think he's talking about them. Sorry. Thank you. Yeah, right. Right, okay. You can take two minutes. Thank you. Yeah. The first thing I want to ask you, maybe it's about what you were going to say, is does your challenge encompass a challenge to the 240 certification? It absolutely does. It encompasses both aspects, both that the programs that were certified as being appropriate to train the employees of Servicios in Mexico were adequate. We challenge that on the merits, as well as the fact that KCS Mexico was allowed to commence operations without putting in place its own program that provided how it was going to have its crews trained and certified by another railroad. So both aspects are part of the pilot program. But the pilot program, that's not the only final action. That is one final action, and we agree that absolutely it was done in violation of the Hobbs Act. And the government, we addressed it only because the government argued you can't challenge any aspect of the pilot program because you didn't challenge that one within 60 days after we let it happen without publication. The other aspects, though, the government keeps saying that the putative pilot program, and I would draw the court's attention to every submission in the Joint Appendix, starting with Joint Appendix 47, refers to this as our proposed pilot program. And you find the same at JA4950, 392, 394, 400, at 558, 559, this is a pilot program. It was very clear that the pilot program was the entire, every aspect, including assigning waivers, including allowing different types of hours of service reporting that did not include the essential translators on the train crew, that involved truncated reporting for only for hours worked in the United States, not time worked and waiting time in Mexico. Every aspect of it that was presented on paper by the railroad and blessed by FRA when they allowed them to launch on July 9th, that was the final action, if you will, the latest final action. Do you have any record evidence that, as happened with the certification orders, that say the brake testing waiver, that the railroads here submitted a here's a new brake testing waiver to the FRA and they passively approved it as final agency action? Actually, what we have the record is that they failed to go on the record with that brake testing waiver. Right, so the railroads made a failure here. Well, it's the agency as well. I'm just stopping. Stop for a second. So the argument here is that the railroads didn't. They've been doing this change in brake testing. This is all allegations, to be clear, but they've been doing this change in the brake testing, expanding the waiver they already had in a way that's improper. And what they should have done is gone to the agency and gotten permission. And then you would have fights about whether they could do the permission. But that's what they should have done. Exactly. That sounds like an enforcement. No, it's actually the agency's own responsibility as well. Because when someone comes to you and says, here's a pilot project and it involves X, Y, Z, and we plan to do this and ask you to review and approve it that allows us to do this. I just asked you. You said they didn't. The railroads here asked for the brake testing waiver. Didn't go. No, they originally said we need to assign the waiver to KCSM. So they've gone on the record at every point and documented what it is they plan to do. And FRA's obligation was to say if you're proposing a pilot program that involves these waivers, it has to be done in accordance with the statute and regulations. Okay, but that sounds like what you're complaining about here is not that the, unlike the certification, you're not complaining that they actually approved a transfer of the waiver. We do claim it. And they have said in their briefs. They didn't because no one submitted to them and started that 30-day clock running for passive approval. You can't have it both ways. Well, they have passively approved it without complying with the Hobbs Act. Can you passively approve something without it being formally submitted by the railroads? They did submit it when they made the application and said basically we want to assign the waiver. Okay, I thought we started this conversation with you saying the problem was railroads didn't ask for. Yeah, no, it's in the docket that they asked for it as part of the pilot program, but the government didn't put that on the record and didn't go through the proper procedures to give public notice that that waiver was being requested and was being approved. Well, they say they didn't do, I think their claim is to that is that they haven't done anything. There is no final agency action as to that, that nothing was presented and they didn't do anything. So there's not even an entry for purposes of the Hobbs Act. No, we believe that there was final action, but it was done off the record, and the documents show it. Which document specifically shows it? I was just going to say, we have quite a few cases which say that those kinds of sub salientio approvals, just in the agency communications, don't amount to final agency action. Well, in this case, though, they've made it clear that this was final agency action because they've said you may commence operations and allow them to do it, and we know you're doing it. And where did they say that? Could you just point to me where did they say that? Well, they've proposed. Which email, which one of these emails says that? At JA 47 and 48 and 49, international crew operation, item number three says that use of current break waiver in parents' assignment is part of the proposed pilot project that they're asking the FRA to bless. This is their draft document that they were submitting for purposes of the meeting. This was the initial proposal of the pilot program. Before a meeting, they were having a meeting with the FRA. They were laying out the outlines of the entire program that then ensued. If I understand it, this is what came with. They emailed the FRA and said, would like to have this meeting to talk about this thing you want to do. And they said, fine, can you send me your draft? It says, attached is a copy of our plan for review at JA 44. And this launched the whole development of, together with the agency, of what became the final operating documents that we've cited in our brief all the way through and that was documented in JA 558. What we're both asking you is where in the record did the agency actually approve all of this? Well, that's our allegation is that they failed to do it on the record. They allowed it to happen with their approval by saying, go ahead, this is fine. We have certified it. Where's the go ahead, this is fine? Where'd they say that? I think this here is everything, not just the certification. They have buried it. Where is it? Just show us in the record. Where did they say go ahead? Well, they said that we have reviewed every aspect of the program. Where? Where's this green light? If you look at JA 558, it's the answers to the questions. I'm sorry, did you say 558? Yes, JA 558, 559, and 556. Let's start with one at a time here. Sorry, I'm not as fast as you. 560. They have laid out that they are verifying that this project has the complete approval of FRA. Sorry, which one? Tell me what this is. This is that response to the congressman? Yes. Okay, so what's the language? JA 558 is where it starts. Okay, and tell me which language on this page? See, we can't do it, because my responses are in, okay, I guess it's a lighter font. Yes, it's a light response. And if you look at 559, it says, FRA has done extensive inspections and review of the plan. The Mexican cruise will be in compliance with all FRA regulations. The cruise, but that's the certification order. Right, and then it refers, well, it also requires them to stop, KCS currently operates under a waiver, but it requires them to stop all FRA regulations. It requires them to stop at a bridge. With the new project, this will still be the case. So they are blessing overtly and saying that they have approved KCSM stepping into the shoes of KCSR and doing the same abbreviated break testing at the border. And again, this is all documentation that was hidden from the public and hidden from us until produced after the fact by the agency. But it makes it clear that from the very beginning to the end, they were proposing a pilot program that required several waivers and variances, and the normal procedure for doing that under 49 U.S.C. So when you say with the new project, this will still be the case on the break test waiver, you're saying that's an approval for allowing the Mexican cruise to do it? That means that they are approving, right, that when KCSM. That's again back to approving the cruise to do these things. No, it's approving KCSM crossing the border with the abbreviated break testing waiver. Right, but the question, excuse me, for the break test is who's doing it? And once, maybe I'm wrong, on the waiver, the waiver would allow if when it got to the bridge, the Mexican got off, the Americans got on, it would allow them to do the little break test there and the big one later. Well, it's the railroad's responsibility, so it doesn't matter. It's not a question of whether the crew is certified. That's a different question. I thought in the past what happened is everyone got off and the other crew got on. It doesn't matter where the train was titled to. It's which crew was doing the activity. But it's which railroad. KCS was the railroad that operated it starting at the border, and KCS was responsible for doing the full break test at the border, regardless of what happened in Mexico. So they had to seek and continue to renew a waiver to allow them not to do that. Now, if a different railroad, which is now KCSM, is going to be operating on that stretch of tracks starting at the border and going into Laredo, that's an entirely new railroad. It could be Ferro Carrillo. It could be a Chinese contractor coming in and running with a concession from Mexico. Whoever is running that railroad into the United States needs to apply for and receive its own waiver of the full break testing requirement. I just want to ask you about before the so-called pilot programs, the old thing where they were doing everything on the bridge. My understanding, maybe it's wrong, is that a train could come in from Mexico, which I guess would be a KC-Mexico train, and it would stop on the bridge, and the Mexican crew would get off, and the American crew would get on. Is that correct? Well, yes, but it's also— I'm going to have to do this slowly. My brain is not as fast as yours. So the American crew would get on, and the American crew would do either a full break test or with the waiver would do the little break test here and the big break test in Laredo, correct? Well, the testing is actually done in inspection. The full inspection is done by other people other than— I'm just talking about locations here, all right? So the American crew would come on, do either a mini break test or a full break test on the bridge, depending on whether they had a waiver. It would have to be done at the bridge without a waiver, and they got a waiver. But they had a waiver. KCS got a waiver, yes. KC-American got a waiver. So it didn't have to do the test while the Mexican railroad was running the train. Is that the idea? The waiver— Now they've allowed the Mexican railroad to come in just as any other— Not now. I'm talking about before all of this. Even though the train came from Mexico— It was not KCS-Mexico's train once it hit the border. Once it was taken possession of by KCS-American, it became the American railroad's train and they were responsible for it. And the question I have is if just assuming the 240 certification were legitimate— I know you have your APA challenge, but just assume they were legitimate so they could certify these crews. Then if they're KC-American certified crews, which happen to include Mexican engineers, are doing the brake test on the bridge, the mini-brake test under the waiver, does that count as KC-American doing the brake test because they've certified the crew? Put aside your argument about whether they could do it. I'm assuming you lost that argument for this question. No, it doesn't count, Your Honor, because what the new arrangement is— and this is another aspect of the agency's failure to actually get the operating agreement that laid out whose railroad it was and whose responsibility it was— but once KCS-Mexico crosses the border and operates in the United States, everything that is required to be done by any other railroad is KCS-Mexico's responsibility. So they are starting from scratch and they themselves need to apply to the agency— It was perfectly fine to have a train that came from Mexico that, shall we say, belonged to KC-Mexico, and as long as their crew got off and your members got on— And KCS-R, the U.S. railroad, the KCS-American took responsibility and says we are the railroad that is operating from point zero. Yes, which is what their papers do here. We're responsible for doing everything. And that's what the certification would do. Yeah, but now what they've said is that we are not the railroad operating from point zero. We only operate once it arrives in the Laredo Yard 10 miles away. It's not our responsibility. Where did they say that? I thought they said that they are now— No, that's part of their complaint is that— But where do they say that? They say that in the interchange agreement, which was part of the proposed pilot program but was not documented by the FRA. Where in the interchange agreement do they say that? The interchange agreement is attached as part of the standing addendum. Yeah, I've got the interchange agreement. Where do they say— It is essay 37 through 57. I'm sorry, it's where? At standing addendum 37 through 57. That's a separate addendum. Sorry, I've got a 19-page interchange agreement. Yes. What page of the interchange agreement? I'm looking at the definition. I'm sorry, I don't have it in front of me. I'm looking at the definition of who is the user and who is the owner of the track. And it makes it very clear that the user is KCSM. The owner of the track has no responsibility for what is done by the user who is being given operating rights over that track. And so the user is KCSM and whatever contractors it chooses to contract— And this interchange agreement was submitted to the FRA? We believe it must have been, but it has not been produced. You don't have any—wait. It has not been produced. Well, then how do we know that they even signed off on this? Because they have referred to the fact in their statement of facts that this was a standard interchange agreement that involved just a switching of interchange from the border to then when it physically now becomes KCSR's responsibility. So they have made that representation, but without any reference to a factual support for it. We have provided the operating agreement that was referenced in the pilot program submission and that, again, is another aspect of procedural. This should have been addressed and taken account of by the agency when saying we're perfectly fine with having this American company vouch for everything that is going on by this other railroad, which is an entirely separate legal entity over which we have no control. And as to which the interchange agreement confirms that we disclaim any control, all we're going to do is make them indemnify us if we get in trouble for letting them use our tracks. Thank you. Thank you. Case is submitted. Thank you.
judges: Tatel, Millett, Pillard